

**SIGNED this 8th day of December, 2011**

Marcia Phillips Parsons
**UNITED STATES BANKRUPTCY JUDGE**

**[This opinion is not intended for publication as the precedential effect is deemed limited.]**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE

|  |  |
|---|---|
| In re | |
|    GLENN S. MARTIN, JR., | No. 08-52631 |
| | Chapter 7 |
|        Debtor. | |
| RICHARD F. RAY, Trustee, | |
|    Plaintiff, | |
| vs. | Adv. Pro. No. 10-5059 |
| JANET KAY AIKEN MARTIN GARLAND and JOSEPH F. MATCHETT, | |
|    Defendants. | |

## M E M O R A N D U M

APPEARANCES:

Michael H. Fitzpatrick, Esq.
800 S. Gay Street, Suite 2121
Knoxville Tennessee, 37929
*Attorney for Plaintiff*

Kay Aikin
122 Fairway Point
Unicoi, Tennessee 37692
*Pro Se Defendant*

**Marcia Phillips Parsons, Bankruptcy Judge.**   In this adversary proceeding, Richard F. Ray, the chapter 7 Trustee, alleges that debtor Glenn S. Martin, Jr. conspired with defendants Janet Kay Aiken Martin Garland ("Ms. Aiken") and Joseph F. Matchett, his former wife and brother-in-law respectively, to defraud his creditors prepetition and his bankruptcy estate postpetition.  Based on this alleged conspiracy, the Trustee asserts that the Defendants are jointly and severally liable for the diverted property and punitive damages. Alternatively, the Trustee seeks to avoid and recover the diverted property pursuant to 11 U.S.C. §§ 548(a)(1)(A), 549(a), and 550(a).  A trial was conducted on September 27, 2011.  As discussed below, the court concludes that the Trustee's conspiracy claim is fatally defective, and that Mr. Matchett was not a transferee under § 550(a).  However, the court will enter a judgment against Ms. Aiken under 11 U.S.C. §§ 549 and 550(a) in the amount of $341,801.74.  This is a core proceeding.  *See* 28 U.S.C. § 157(b)(2)(A), (H) and (O).

I.

The Debtor, who appears to be in his late 60's, has engaged for most of his life in the farming and trade of tobacco, including the operation of various tobacco brokerage warehouses. In connection with these operations, the Debtor was indicted in 1989 for illegally acquiring over-quota tobacco using fraudulently obtained tobacco marketing cards.  As part of a plea agreement, he pled guilty and was imprisoned for 30 months.  Arising out of that same conduct, the United States Department of Agriculture assessed the Debtor a tobacco marketing quota penalty in the amount of $1.8 million for the commingling and false identification of tobacco, with the Debtor eventually entering into a consent judgment in the amount of $1,791,727.27 in September 1997 in favor of the United States.  In 2001, this court concluded in the Debtor's first chapter 11 case that this judgment was nondischargeable under 11 U.S.C. § 523(a)(7).  *See Martin v. USDA (In re Martin)*, No. 00-2052, slip op. at 2 (Bankr. E.D. Tenn. Mar. 30, 2001).

Notwithstanding his felony conviction, imprisonment, and outstanding judgment, the Debtor continued farming and operating his tobacco warehouses, which were essentially consignment businesses where the farmers consigned their tobacco to him for sale.  The Debtor also operated a farm equipment business. On December 18, 2008, less than a week before Christmas, the United States levied on the Debtor's bank accounts, seizing $275,000 and prompting the Debtor to

2

commence the current bankruptcy case under chapter 11 on December 31, 2008. The majority of the attached funds were monies that the Debtor had received in payment of consigned tobacco and which were slated to be paid to other tobacco farmers. Immediately upon learning of the levy, the Debtor contacted the drawer of a $100,000 check that was in the Debtor's bank account at the time of the levy and had him stop payment on the check and reissue it to Wendy Shelton, the Debtor's bookkeeper. At the Debtor's direction, Ms. Shelton paid the farmers with the proceeds and then set up a shadow operation, whereby the Debtor continued to operate his businesses but with the proceeds going through Ms. Shelton's bank account rather than the Debtor's or a debtor-in-possession account. Upon the disclosure of this practice, the court granted the United States' request for the appointment of a trustee and Mr. Ray was appointed on March 2, 2009. Mr. Ray operated the Debtor's businesses under chapter 11 until June 17, 2010, when the case was converted to chapter 7. Mr. Ray thereafter continued as trustee.

Subsequently, the Trustee sought and was granted a judgment against Ms. Shelton and her company, Kentucky Tennessee Burley Procurement, Inc., in the amount of $45,000 pursuant to 11 U.S.C. §§ 549 and 550 for the funds that she and her company had personally profited from the Debtor's shadow operations. Additionally, the Trustee objected to the Debtor's discharge. The Debtor failed to appear at the trial in the discharge proceeding and, after the conclusion of proof, the court entered an order on February 3, 2011, denying the Debtor's discharge pursuant to 11 U.S.C. § 727(a)(2)(B) and (a)(3).

The Trustee commenced the present adversary proceeding on August 6, 2010. Both Defendants filed *pro se* answers and have appeared *pro se* throughout the case. Mr. Matchett did not attend the September 27 trial. Ms. Aiken appeared but did not testify. The Plaintiff's primary witnesses were the Debtor and the Trustee.

## II.

The Debtor and Ms. Aiken were married from 1989 through 1999. After their divorce, she continued working with the Debtor in his businesses. Defendant Joseph Matchett, Ms. Aiken's brother, worked for the Debtor on his farm as a laborer. According to the Trustee's allegations, after

3

the Debtor's activities with Ms. Shelton were disclosed and the Trustee appointed, the Debtor continued his practice of hiding his business proceeds from the Trustee through a conspiracy that had begun years earlier in order to thwart the collection efforts of the United States.[1]

As evidence of this conspiracy, the Trustee points to the fact that at least from 2005 forward, the Debtor listed the names of other individuals, including the Defendants, as the "producers" and "operators" of his crops for purposes of crop insurance with Rural Community Insurance Service ("RCIS"), in connection with the federal tobacco buyout program known as Tobacco Transition Payment Program ("TTPP"),[2] and with respect to the federal program known by the acronym SURE, the Supplemental Revenue Assistance Payments Program.   According to the Trustee, these false listings allowed the Debtor to hide numerous checks that he received from the sale of crops, the federal programs, and crop insurance.   Generally speaking, although others were the named

---

[1] As evidence of his allegation that the conspiracy among the Debtor and the Defendants was long-standing, the Trustee established that during the Debtor and Ms. Aiken's marriage, but prior to 1994, a farm in Washington County, Tennessee was conveyed to the Debtor by warranty deed but not recorded.   On February 24, 2004, Ms. Aiken, using a power of attorney on behalf of the Debtor, executed a quitclaim deed to the farm, conveying it to herself but not recording the deed.   When the couple divorced in 1999, the final judgment of divorce stated that Washington County real property, the deeds of which were set forth in Exhibit B, would vest in the Debtor.   However, no Exhibit B was attached to the recorded divorce judgment.

In his November 10, 2009 deposition, the Debtor testified that it was his understanding that he was purchasing the farm through a lease purchase arrangement with the previous owner, U.S. Keebler.   Regarding the quitclaim deed to Ms. Aiken, the Debtor stated in his deposition that he had not seen the deed before but believed that it related to the USDA Farm Service Agency's records and a claim asserted against him by a prior wife.   He denied that the deed was executed to protect the land from the United States' judgment.

The Trustee does not seek to avoid the transfer to Ms. Aiken in this action and, from the evidence, has been able recover the real property for the benefit of the estate through other means.

[2] Historically since the Great Depression, the federal government regulated how much tobacco an individual farmer could grow in a given year, with the goal of keeping the price of tobacco high by limiting the supply.   In 2004, acreage allotments and price supports were eliminated.   To help tobacco farmers transition to the free market, Congress adopted the TTPP, also called the "tobacco buy-out," whereby tobacco quota holders were paid either in a lump-sum or annual transitional payments over 10 years. *See* http://www.fsa.usda.gov/FSA/webapp?area=home&subject=toba&topic=landing.

producers of the crops, the addresses listed for the individuals were the Debtor's post office boxes, such that the Debtor received the checks.

The Debtor attributed a less nefarious motive to the practice. According to the Debtor, the division of producer status among multiple parties for purposes of acquiring crop insurance coverage and government farm payments was a historical practice, common within the tobacco farming community. As explained by the Debtor in his October 20, 2009 deposition, the USDA Farm Service Agency allowed farmers to divide a farm into multiple "farms" in the names of their children, spouses, and other parties. Traditionally, this was done to avoid limitations placed on tobacco production but remained even after the government's transition away from production limitations. Similarly during his November 10, 2009 examination, the Debtor explained that farm operator status was rotated among various parties in order "to keep your insurance coverage up," and that any farmer who did not rotate operator status for purposes of crop insurance would be faced with declining coverage, potentially reducing coverage close to the amount of the premium. Despite the irregular appearance of this strategy, the Debtor stated that crop insurance agents directly advised farmers how to "float" insurance coverage on their crops to maintain coverage levels.

After the Debtor's bankruptcy filing and the subsequent appointment of the Trustee, the Debtor gave the Trustee a list of the various nominee names under which he operated, and for a period of time the Debtor and the nominees endorsed checks from the sale of crops and from crop insurance over to the Trustee. However, at some point this practice stopped, and the Debtor began depositing the checks and other estate funds first into his own and then into Ms. Aiken's bank account. According to the Debtor, he made this change because he was dissatisfied with the Trustee's handling of the estate and believed that the Trustee was not paying the farmers or the expenses of warehouse operations as quickly as he should.[3] In the same vein, Ms. Aiken complained

---

[3] For example, during the Trustee's counsel's trial examination of the Debtor regarding funds deposited into Ms. Aiken's bank account following the sale of tobacco in 2010, the following exchange occurred:

Q: So you took it upon yourself to administer the estate's money through [Ms. Aiken's] account?

(continued...)

in her answer about the Trustee's delay in paying farmers and other expenses of estate operations, and asserted that she paid numerous farm and warehouse expenses out of her bank account, including a crop insurance premium on behalf of the estate after the Trustee had refused to pay it until he researched the matter.  Although the exact dates were not clear from the record, during part of the relevant time period Ms. Aiken was employed by the Trustee to assist the estate in selling its tobacco plants and straw.

Regardless of the motives of the parties, it appears undisputed that postpetition the Debtor, with Ms. Aiken's assistance and active participation, diverted funds belonging to his bankruptcy estate and then used some of the diverted funds to pay expenses of the estate and to directly pay some of his creditors.  The Trustee seeks a judgment against the Defendants, jointly and severally, for all of the amounts diverted by the Debtor, plus punitive damages based on the estate's conspiracy cause of action.  Additionally, the Trustee alleges that the various checks are avoidable transfers under §§ 548(a)(1) and 549(a) of the Bankruptcy Code and recoverable under § 550(a).  In this regard, the Trustee does not allege specifically that the Debtor or the Defendants profited from their diversion activities, at least with respect to the postpetition transactions.  To the contrary, the Trustee's pretrial brief suggests that the Defendants did not benefit.  [Trustee's brief, p. 18.] ("Although the value of the transfers was kept by the [D]ebtor, all perpetrators in a fraud are liable for the fraud.")

The Trustee's proof at trial concerned 40 checks totaling $695,946.38.  Exhibit A to this memorandum lists these checks by date, drawer, payee, and amount.  The first three checks listed were dated and honored prepetition during the year preceding the December 31, 2008 bankruptcy filing; the remaining thirty-seven checks are postpetition.  With the exception of the three prepetition checks, the information in Exhibit A was taken from Exhibit 35 introduced at trial.  Before addressing the specifics of each check, the court will first address the causes of action asserted by the Trustee.

---

[3](...continued)
A:  Yes, again, no disrespect [to the Trustee], people weren't getting paid and they must be paid.

III.

A.  Civil Conspiracy

As stated previously, the Trustee contends that the Debtor engaged in a conspiracy with Ms. Aiken prepetition to defraud his creditors, namely the United States, and that postpetition, the Debtor and both Defendants engaged in a conspiracy to defraud the bankruptcy estate.  Regarding the alleged prepetition conspiracy, however, "[i]t is well established that a trustee has no standing to bring tort claims that belong exclusively to creditors of the bankruptcy estate." *Ingalls v. Gressett (In re Bradley)*, 326 Fed. Appx. 838, 839 (5th Cir. 2009) (citing *Caplin v. Marine Midland Grace Trust Co.,* 406 U.S. 416, 433-34, 92 S. Ct. 1678 (1972) (holding that a trustee lacked standing to sue a third party for damages incurred by debenture holders of the corporate debtor)); *see also Steinberg v. Buczynski,* 40 F.3d 890, 893 (7th Cir. 1994) ("When a third party has injured not the [debtor] itself but a creditor of [the debtor], the trustee in bankruptcy cannot bring suit against the third party.  He has no interest in the suit."); *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d. Cir. 1991) (when a debtor has joined with a third party in defrauding the debtor's creditors, the trustee cannot recover against the third party for the damage to the creditors); *Picard v. JPMorgan Chase & Co.,* Nos. 11 civ 913 and 4212, 2011 WL 5170434, *3 (S.D.N.Y. Nov. 1, 2011) (trustee of Bernard Madoff bankruptcy estate lacked standing to pursue on behalf of victims of Ponzi scheme common law damage claims for aiding and abetting fraud and conversion); *Jones v. Hyatt Legal Services (In re Dow)*, 132 B.R. 853, 861-62 (Bankr. S.D. Ohio 1991) (trustee without standing to bring claim that the defendants assisted the debtor in furtherance of the debtor's scheme of fraudulently conveying property with the intent to hinder, delay, or defraud creditors).

As explained in the treatise *Collier on Bankruptcy*, the actions that a trustee is authorized to commence are limited to two categories: "(1) those brought by the trustee as successor to the debtor's interest included in the estate under section 541 . . . ; and (2) those brought under one or more of the trustee's avoiding powers."  3 *Collier on Bankruptcy* ¶ 323.03[2] (16th ed. 2011).  The former, broadly defined, refers to causes of action possessed by the debtor as of the bankruptcy filing.  *Parker v. Goodman (In re Parker)*, 499 F.3d 616, 624 (6th Cir. 2007) (quoting 11 U.S.C. § 541(a)(1)).  As to these claims, a trustee stands in the shoes of the debtor and is subject to the same

7

defenses that could have been asserted by the defendant had the action been instituted by the debtor. 3 *Collier on Bankruptcy* ¶ 323.03[2]. Because the Debtor in the present case would be barred as an alleged co-conspirator from prosecuting a prepetition conspiracy claim against the defendants pursuant to the doctrine of *in pari delicto*, the trustee similarly is precluded. *See Erricola v. Gaudette (In re Gaudette)*, 241 B.R. 491, 498-500 (Bankr. D.N.H. 1999) (and cases cited therein); *see also Prism Partners, L.P. v. Figlio*, No. 01A01-9703-CV-00103, 1997 WL 691528, *6 (Tenn. App. Nov. 7, 1997) (quoting *C.F. Simmons Med. Co. v. Mansfield Drug Co.*, 23 S.W. 165, 168 (Tenn. 1893) ("Under the doctrine of unclean hands, 'he who comes into a court of equity, asking its interposition in his behalf, must come with clean hands; and if it appears from the case made by him or by his adversary that he has himself been guilty of unconscionable, inequitable, or immoral conduct in and about the same matters whereof he complains of his adversary, or if his claim to relief grows out of or depends upon or is inseparably connected with his own prior fraud, he will be repelled at the threshold of the court.'")); *Brooks v. Creech*, No. M2001-02355-COA-R3-CV, 2003 WL 174805, *6 (Tenn. App. Jan. 28, 2003) (applying the doctrine of unclean hands to bar the recovery of a co-conspirator).

Further, the Trustee's avoiding powers do not enable him to pursue a prepetition conspiracy cause of action. The only possibility is § 544 of the Bankruptcy Code which permits "the trustee [to] avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502." 11 U.S.C. § 544(b)(1). However, "[s]ection 544 is limited to avoidance actions and does not give the trustee standing to pursue tort claims that were not the property of the estate at the commencement of the case." 5 *Collier on Bankruptcy* ¶ 544.01 (16th ed. 2011) (footnote omitted) (Section 544 "does not transform the trustee into a 'super creditor.'"). *See, e.g.*, *Hyundai Translead, Inc. v. Jackson Truck & Trailer Repair Inc.*, 419 B.R. 749, 761 (M.D. Tenn. 2009) ("Bankruptcy courts have consistently held that neither § 544(b) nor § 550 authorizes a trustee to pursue conspiracy or 'aiding and abetting' state law claims."). Moreover, courts have consistently held that "there is no such thing as liability for aiding and abetting a fraudulent conveyance or conspiracy to commit a fraudulent transfer as a matter of federal law under the Code." *Id.*

8

With respect to the Trustee's postpetition conspiracy cause of action, the Trustee also has procedural problems, albeit of a different nature.[4]  Initially, the court notes as set forth in the Trustee's pretrial brief that Tennessee recognizes the concept of civil conspiracy.  As defined by the Tennessee Supreme Court, "[a]n actionable civil conspiracy is a combination of two or more persons who, each having the intent and knowledge of the other's intent, accomplish by concert an unlawful purpose, or accomplish a lawful purpose by unlawful means, which results in damage to the plaintiff."  *Trau-Med of Am., Inc., v. Allstate Ins. Co.,* 71 S.W.3d 691, 703 (Tenn. 2002).  In this regard, the Trustee in the present case points to various facts which he alleges establishes each of the required elements of a civil conspiracy.  However, the fact that a conspiracy exists does not, in and of itself, create a cause of action.  A conspiracy is not independently actionable.  *Watson's Carpet & Floor Coverings, Inc. v. McCormick*, 247 S.W.3d 169, 186 (Tenn. App. 2007).  "Civil conspiracy requires an underlying predicate tort allegedly committed pursuant to the conspiracy."  *Id*.  Once the underlying tort is established, the existence of a conspiracy is a means of establishing vicarious liability.  *Id.*; *see also Freeman Mgmt. Corp. v. Shurgard Storage Ctrs., LLC*, 461 F. Supp. 2d 629, 642-643 (M.D. Tenn. 2006) ("Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration. By participation in a civil conspiracy, a coconspirator effectively adopts as his or her own the torts of other coconspirators within the ambit of the conspiracy. In this way, a coconspirator incurs tort liability co-equal with the immediate tortfeasors.").

The only tort referenced by the Trustee in his pretrial statement and brief is fraud, but none of the elements of fraud is mentioned or addressed.  In Tennessee, a common law cause of action

---

[4] Unlike the prepetition claim, it has been held that the Trustee has standing to pursue a conspiracy claim arising postpetition on behalf of the estate. *See Hill v. New Concept Energy, Inc. (In re Yazoo Pipeline Co., L.P.)*, ___ B.R. ___, 2011 WL 4902960, *3 (Bankr. S.D. Tex. 2011); *Rosen v. Gemini Title & Escrow, LLC (In re Hoang)*, 449 B.R. 850, 858 (Bankr. D. Md. 2011); *Giacometti v. Arton Bermuda Ltd. (In re Sia)*, 349 B.R. 640, 655 (Bankr. D. Haw. 2006). Moreover, the Debtor's misconduct would not be imputed to the Trustee under the *in pari delicto* doctrine. *See In re Hoang*, 449 B.R. at 856.

9

for fraud has the following elements:

> When a party intentionally misrepresents a material fact or produces a false impression in order to mislead another or to obtain an undue advantage over him, there is positive fraud. The representation must have been made with knowledge of its falsity and with a fraudulent intent. The representation must have been to an existing fact which is material and the plaintiff must have reasonably relied upon that misrepresentation to his injury.

*Brown v. Birman Managed Care, Inc.*, 42 S.W.3d 62, 66-67 (Tenn. 2001).

None of these elements appear to exist in the present case as to the parties' postpetition conduct. There was no allegation or evidence of an intentional misrepresentation or false impression by the Debtor or the Defendants. Nor is there any suggestion of reliance in any respect by the Trustee. Granted, Ms. Aiken assisted the Debtor in diverting property of the estate via the Debtor's nominee practice, but the Trustee knew from the time of his appointment that the Debtor had placed his crops in the names of nominees and, in fact, the nominees initially endorsed the checks to the estate. The fact that the Defendants subsequently refused or failed to turn the checks over to the Trustee may constitute conversion,[5] but it is not fraud.

Also lacking is proof of damages from the alleged conspiracy to defraud. When asked at trial the damages sustained by the estate due to the alleged conspiracy, counsel for the Trustee responded

---

[5] In his complaint, the Trustee alleged conversion and fraud, but there was no allegation of conspiracy as to either; nor did the Trustee assert joint and several liability. The Trustee requested a judgment for the value of the property converted and transferred, plus interest and punitive damages. Pursuant to this court's scheduling order entered January 11, 2011, the parties were directed to file a joint pretrial statement setting forth the issues that remain for trial. The pretrial statement filed by the Trustee on June 17, 2011, listed the Trustee's causes of action against Ms. Aiken as: (1) fraudulent conveyances under § 548(a)(1)(A); (2) unauthorized postpetition transfers under § 549(a); and (3) civil conspiracy to defraud both prepetition and postpetition. The listed causes of action against Mr. Matchett were the same with the exception of § 548(a)(1)(A) and prepetition conspiracy. As to both Defendants, the Trustee requested judgment for the property diverted, interest, and punitive damages. Neither the Trustee's pretrial statement nor pretrial brief referenced conversion as a cause of action.

Notwithstanding the absence of conversion as a stated basis for relief, the evidence does not indicate any conversion of funds by the Defendants that is not otherwise recoverable by the estate under §§ 549(a) and 550(a).

that the Trustee had been unable to make that determination due to the Debtor's and the Defendants'
diversion activities.  Consequently, the Trustee simply seeks judgment in the amount of the diverted
checks, even though some were used to pay estate expenses and creditors of the estate.  While the
court is sympathetic to the Trustee's difficulty, one of the required elements of a cause of action for
conspiracy to defraud is damages or injury to the plaintiff as a result of the fraud.   16 Am. Jur. 2d
*Conspiracy* § 63 (2011).  Thus, proof of such injury in an ascertainable amount is necessary if the
Trustee desires to recover on this claim.  Because of all the foregoing deficiencies, the Trustee's
conspiracy claim must be rejected.

     B. <u>Fraudulent Conveyance</u>.

     "To prevail on a claim for fraudulent transfer under § 548(a)(1)(A), the Trustee must prove
the following elements of § 548(a)(1)(A): (1) a transfer was made of the Debtor's property; (2) the
transfer was made within two years of the Petition Date; and (3) the transfer was made with actual
intent to hinder, delay, or defraud the Debtor's creditors."  *West v. Hsu (In re Advanced Modular
Power Systems, Inc.)*, 413 B.R. 643, 673 (Bankr. S.D. Tex. 2009) (citing *Havis v. AIG Sunamerica
Life Assurance Co. (In re Bossart)*, No. 06-3540, 2007 WL 4561300, at *9 (Bankr. S.D. Tex. Dec.
21, 2007)).

     The avoidance of a transfer does not automatically establish a defendant's liability for the
recovery of an avoided transfer.  As stated by the Sixth Circuit, "[a]lthough related conceptually,
these two issues must be kept analytically separate."  *Taunt v. Hurtado (In re Hurtado)*, 342 F.3d
528, 532 (6th Cir. 2003) (citing *Suhar v. Burns (In re Burns)*, 322 F.3d 421, 427 (6th Cir. 2003)).
A defendant's liability for an avoided transfer is set forth in § 550 of the Bankruptcy Code:

> (a) Except as otherwise provided in this section, to the extent that a transfer is
> avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the
> trustee may recover, for the benefit of the estate, the property transferred, or, if the
> court so orders, the value of such property, from–
>
> > (1) the initial transferee of such transfer or the entity for whose benefit such
> > transfer was made; or
> >
> > (2) any immediate or mediate transferee or such initial transferee.

11 U.S.C. § 550(a).

As the foregoing indicates, recovery is available only from a defendant who qualifies as a "transferee." Although the term is not defined by the Bankruptcy Code, the Sixth Circuit Court of Appeals in *Hurtado* adopted a standard for transferee previously established by the Seventh Circuit. *See In re Hurtad*o, 342 F.3d at 533 (citing *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 893 (7th Cir. 1988)). "[T]he minimum requirement of status as a 'transferee' is dominion over the money or other asset, the right to put the money to one's own purposes." *Id.* (referring to this standard as the "dominion-and-control test"). In effect, this "requir[es] that a party do more than merely touch the money before becoming a 'transferee.'" *In re Hurtado*, 342 F.3d at 533. More specifically, "a party is not to be considered an initial transferee if it is merely an agent who has no legal authority to stop the principal from doing what he or she likes with the funds." *Id.* at 534 (citations omitted).

In the present case, the first three checks listed in <u>Exhibit A</u> to this memorandum were issued prepetition to Ms. Aiken. The first check dated January 24, 2008, was in the amount of $11,857.30 for the TTPP program; the second check dated October 10, 2008, was in the amount of $16,674.00 for hail loss covered by crop insurance; and the third check dated October 31, 2008, was in the amount of $952.00 from the USDA. Although Ms. Aiken was the named payee on all three checks, the evidence established that they were property of the Debtor. The first check was expressly identified as property of the Debtor in Requests for Admissions to which Ms. Aiken failed to respond. As to the second and third checks, the Debtor testified at trial that they were monies owing to him from his crops and his testimony was not refuted. Given the broad definition of transfer under § 101(54) of the Code, the listing of Ms. Aiken's name on these checks arguably could constitute transfers, thereby establishing the first two elements of an avoidable transfer under § 548(a)(1), a transfer of the Debtor's property within two years of the petition date. *See* 11 U.S.C. § 101(54) (Definition of "transfer" includes "each mode, direct of indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with– (1) property; or (ii) an interest in property.").

Nonetheless, it is unnecessary for the court to determine the existence of the third element of a fraudulent conveyance, actual intent to hinder, delay or defraud the Debtor's creditor, because there was no evidence that either of the Defendants was a transferee of the three prepetition checks such

12

that the Trustee may recover from them under § 550(a).  Notwithstanding the fact that Ms. Aiken was the payee on the checks, there was no evidence that she ever had possession of the checks or of their proceeds, much less the legal dominion and control required to be a transferee under § 550(a).  All three checks indicate on their face that they were mailed to the Debtor's post office box.  The Debtor testified that he endorsed the checks and deposited them in his BB&T bank account.  This testimony was confirmed by the routing information on the checks.  According to Ms. Aiken's deposition testimony, she did not have access to the Debtor's post office box, and she had no knowledge of the checks.  Similarly, there was no evidence that Mr. Matchett was ever in possession of the checks or that he received any of their proceeds.  Moreover, the Trustee acknowledges in his pretrial brief that "the value of the transfers were kept by the debtor."  [Trustee's brief, p. 18.]  Accordingly, to the extent the Trustee seeks recovery from the Defendants under § 550(a) for the avoidance of fraudulent transfers under § 548(a)(1)(A), the request must be denied.[6]

C. Postpetition Transfer

Subject to certain exceptions that are inapplicable here, the Bankruptcy Code permits a trustee to avoid a transfer of property of the estate "that occurs after the commencement of the case," and which is not authorized by the Bankruptcy Code or by the court.  11 U.S.C. § 549(a).  In the case of an individual debtor in chapter 11:

property of the estate includes, in addition to the property specified in section 541–

---

[6] There is some suggestion in the Trustee's pretrial brief that the Trustee also seeks to avoid under § 548(a)(1)(A) the placement of the crops in Ms. Aiken's name. [Trustee's brief, pp. 17-18.] (The transfers at issue are "the placement of the right to crops grown by the debtor and the related insurable interest in the name of [Ms. Aiken].")  Although unclear, presumably the Trustee was referring to the Debtor's listing of Ms. Aiken as the owner of the crops with the USDA Farm Service Agency, which took place in 2005, outside of the two year reach-back of § 548(a)(1).  To overcome this deficiency, the Trustee suggests that concealment of this transfer continued into the two years prior to the bankruptcy filing, with the Debtor making all of the decisions regarding the crops and receiving all of the proceeds from the sale of the crops and crop insurance, although in Ms. Aiken's name.  However, the evidence does not support the Trustee's contention that the Debtor's transfer of legal title to Ms. Aiken was concealed.  To the contrary, the placement of Ms. Aiken's name as producer or operator of the crops was registered with the USDA Farm Service Agency, the same United States that the Trustee contends was being defrauded.  Accordingly, to the extent that the Trustee seeks avoidance of the 2005 transfer, it must be denied.

    (1) all property of the kind specified in section 541 that the debtor acquires after the
commencement of the case but before the case is closed, dismissed, or converted to
a case under chapter 7, 12, or 13, whichever occurs first; and

    (2) earnings from services performed by the debtor after the commencement of the
case but before the case is closed, dismissed, or converted to a case under chapter 7,
12, or 13, whichever occurs first.

11 U.S.C. § 1115(a). Furthermore, "[t]he Trustee bears the burden of proving what may be avoided

pursuant to § 549." *Springel v. Prosser (In re Innovative Commc'n Corp.)*, No. 08-3004, 2011 WL

3439291, *45 (Bankr. D.V.I. Aug. 5, 2011) (citing *ETS Payphones, Inc. v. AT&T (In re PSA, Inc.)*,

335 B.R. 580, 584 (Bankr. D. Del. 2005)).

    The Trustee seeks to avoid and recover 37 postpetition checks totaling $658,463.08[7] which

he contends were unauthorized transfers of property of the estate. The checks were issued after the

filing of the petition and prior to the bankruptcy case's conversion to chapter 7, but were never

delivered to the Trustee or deposited in a debtor-in-possession account. The checks are set forth on

Exhibit A to this memorandum numbered 4 through 40. With the exception of one check, the

evidence established and was unrefuted that the checks represented  property interests of the estate.

The Requests for Admissions propounded to Ms. Aiken listed the checks other than those numbered

7, 32, 33, 36 and 37 and recited that they were property of the estate. As to check no. 7, the Debtor

testified, and his testimony was unrefuted, that the check represented funds owed to him, arising out

of his farming and business operations. Regarding check no. 36, the Requests for Admissions to Mr.

Matchett to which he failed to respond and which were introduced into evidence established that the

check represented monies owing to the estate. The Trustee testified that check no. 37 was for the sale

of tobacco sold by the bankruptcy estate. Check no. 33 was a check from Heritage Bank to Ms.

Aiken which she deposited it into her Eastman Credit Union account. The Requests for Admissions

established that the Heritage Bank account was set up with funds belonging to the estate, specifically

---

    [7] Exhibit 35 introduced by the Trustee at trial calculated the total at $666,463.08. One of the
checks listed was number 1645 dated February 9, 2009, from Kentucky/Tennessee Burley to Ms.
Aiken in the amount of $9,933.60. Exhibit 13 from trial includes a copy of this check and reveals
that the correct amount of the check is $1,933.60. This particular check is number 10 on Exhibit A
to this memorandum.

a check from Joe P. Irving in the amount of $48,635.06 dated November 23, 2009.  However, there was no evidence that check no. 32 represented estate property.  Check no. 32 was for straw and the Debtor testified that Ms. Aiken grew a little straw.  Accordingly, the court concludes that the 37 postpetition checks the Trustee seeks to avoid under § 549(a) of the Code, with the exception of check no. 32, represented property interests of the estate.  Because the transfers were unauthorized, the transfers are subject to avoidance under 11 U.S.C. § 549(a).

As stated above, avoidance does not automatically result in a right of recovery under § 550(a) of the Bankruptcy Code, but is limited to defined transferees.  With respect to Mr. Matchett, there is no evidence that he had the requisite dominion or control over any of the checks or that the proceeds were ever conveyed to him such that he was a transferee within the meaning of § 550(a).  Granted, three checks from RCIS representing proceeds from crop insurance were payable to him (check nos. 26, 27, and 36 on Exhibit A), but it is unclear from the evidence whether he ever saw or had possession of the checks.  All three checks appear to be endorsed in blank, first by Joseph F. Matchett and then Kay Aiken, and then deposited into Ms. Aiken's bank account at Eastman Credit Union.  However, at Mr. Matchett's deposition which was taken on January 26, 2010, before the issuance of the third check in his name, Mr. Matchett testified that he had never seen the first two checks, that he had not endorsed them, and that he had not received any of the proceeds from them.  According to Mr. Matchett, the only documents signed by him were two applications for crop insurance that he executed at the Debtor's direction.  Mr. Matchett denied ever receiving any funds from the Debtor other than a paycheck, and testified that he had received no funds from Ms. Aiken.  Check no. 27 listed the Debtor's post office box as the mailing address, and Mr. Matchett testified at his deposition that he did not use the Debtor's post office box.  At Ms. Aiken's deposition, also taken before the third check to Mr. Matchett was issued, Ms. Aiken testified that "as far as she could remember," Mr. Matchett gave her the two checks, although she was not certain, and she did affirmatively testify that it was Mr. Matchett's endorsement on the second check. (She was not asked if it was his endorsement on the first check.)  Regarding the third check made payable to Mr. Matchett dated March 30, 2010 (check no. 36 on Exhibit A), there was no testimony establishing who endorsed the check, but the check lists Debtor's post office box as the address, and the check was deposited into Ms. Aiken's bank account.  A writing sample of Mr. Matchett's signature is attached

15

to his deposition transcript, and the signature appears to the court's untrained eye to be significantly different than the purported endorsement of Mr. Matchett on the three checks.

Notwithstanding the foregoing contradictory testimony regarding Mr. Matchett's endorsement on two of the checks, the Requests for Admissions propounded by the Trustee to Mr. Matchett, and to which he failed to respond, expressly state that the endorsements on the back of the three checks are that of Joseph F. Matchett and Kay Aiken.  Nonetheless, endorsement alone does not establish that Mr. Matchett had the requisite legal dominion and control sufficient to render him a transferee under § 550(a).  As previously explained, transferee is not synonymous with possession.  *Bowers v. Atlanta Motor Speedway, Inc. (In re Southeast Hotel Properties L.P.)*, 99 F.3d 151, 156 (4th Cir. 1996) (the term "transferee" as used in § 550 means something different than possessor or holder or agent).  Although a former brother-in-law, Mr. Matchett worked as a laborer on the Debtor's farm entirely at the Debtor's direction.  If he ever actually endorsed the checks, the evidence suggests that he did so simply as the Debtor's agent.  *See First Nat'l Bank of Barnesville v. Rafoth (In re Baker & Getty Fin. Servs., Inc.)*,  974 F.2d 712, 722 (6th Cir. 1992) (agent not initial transferee because the money was not his and he was simply acting at the direction of the principal).  Based on all of the foregoing, the court concludes that the Trustee is unable to recover from Mr. Matchett because he was not a transferee pursuant to 11 U.S.C. § 550(a).

As to Ms. Aiken, the court makes a similar finding as to the first eight of the postpetition checks listed in <u>Exhibit A</u> to this memorandum, check nos. 4 through 11.  Although all but one of these eight checks list Ms. Aiken as the payee, there was no evidence that she ever received the checks or their proceeds.  The Debtor testified that check nos. 4, 6, 9 and 10 were deposited into Wendy Shelton's account, that check no.7 was paid to a creditor, and that check no. 5 was mailed to him, endorsed by him, and paid to a creditor.  Similarly, the Trustee testified that check nos. 8 and 11 were deposited into Wendy Shelton's account and that no check was written back out to Ms. Aiken.  The checks themselves do not list any routing information.  Of the checks she was questioned about, check nos. 4, 6, 8, 9, 10 and 11, Ms. Aiken testified in her deposition that she had never seen these checks before, and that the endorsements on them were not hers.  Accordingly, the court concludes that Ms. Aiken was not a transferee of these eight checks.

16

Regarding the remaining 29 postpetition checks, however, there is a different outcome. While Ms. Aiken is listed as the payee on only 14 of the checks, all 29 checks were deposited into her Eastman Credit Union account or Heritage Bank account. Notwithstanding the evidence that a great deal of the funds were then used to pay expenses of the Debtor's farm or business operations, it appears that Ms. Aiken had sufficient dominion or control over the account, and consequently the funds, to conclude that she was a transferee of the checks. The Debtor was not a signatory on Ms. Aiken's account, except for a brief period of time from August to November 2009, which the Debtor and Ms. Aiken both indicated was for the limited purpose of assisting Ms. Aiken with her banking during a period of illness. Although there was no evidence as to how Ms. Aiken decided whom or what to pay with the deposited funds, the evidence did suggest that Ms. Aiken may have acted at the Debtor's direction in using the funds. Nonetheless, the court is unable to conclude that she was a mere conduit or agent of the Debtor such that she never had dominion or control. *See In re Hurtado*, 342 F.3d at 534 ("[A] party is not to be considered an initial transferee if it is merely an agent who has no legal authority to stop the principal from doing what he or she likes with the funds at issue."). In *Hurtado*, the husband and wife debtors directed various prepetition transfers to the husband's mother, which the trustee later sought to avoid and recover as fraudulent conveyances. *Id*. at 530. In defense, the mother argued that she was a mere conduit for the funds, lacking the requisite legal dominion over the funds sufficient to be considered an initial transferee, because she only distributed the funds according to the desires of the debtors, and never spent any portion of them on herself. *Id.* The Sixth Circuit Court of Appeals rejected this argument, making a distinction between mere possession and ownership. *Id.* at 534. The court noted that the mother had legal title to the funds, that in fact, this was the every point of the transfer to the mother, to insulate the money from the debtors and consequently their creditors. *Id*. at 535. Because the mother had the legal authority and ability to do whatever she wanted with the funds, the fact that she chose to use the funds in accordance with the debtors' wishes did not in any way undercut that legal authority and ability. *Id.*

As an initial transferee,[8] Ms. Aiken is subject to strict liability for the transfers she received.

---

[8] Although not clear with respect to every check, it appeared that Ms. Aiken was an initial

(continued...)

17

*See In re Hurtado*, 342 F.3d at 532-33 (citing *In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*, 130 F.3d 52, 57 (2d Cir. 1997)); *see also Sullivan v. Gergen (In re Lacina)*, 451 B.R. 485, 491 (Bankr. D. Minn. 2011) ("[T]he initial transferee of an avoided transfer is strictly liable to the estate, whether it colluded with the debtor or was an innocent and unwitting recipient." (citations omitted)).   Upon the deposit of the postpetition checks into her checking account, Ms. Aiken had the legal ability to use the funds however she may have wanted.  The fact that she chose to exercise that ability on behalf of the Debtor does not negate her dominion and control.   Accordingly, Ms. Aiken is an initial transferee under 11 U.S.C. § 550(a)(1) of 28 postpetition checks totaling $394,798.65 (check nos. 12-40 on Exhibit A with the exception of check no. 32).

Before leaving this subject,  the court notes, as previously observed, that although the evidence did not address the ultimate use of all of the checks deposited into Ms. Aiken's bank account, there was some evidence that the funds were paid to creditors of the estate or used for the expenses of the Debtor's farm and businesses.  For example, sometime prior to March 15, 2009, Ms. Aiken paid a crop insurance premium, preventing the policy from lapsing due to non-payment and permitting the estate to collect $189,000.00 in crop insurance payments.   It also appears that Ms. Aiken at times purchased parts for farm equipment in situations where the Trustee was unwilling to purchase those items immediately.   Moreover, in a letter submitted by Ms. Aiken and designated by this court as an answer to the complaint, Ms. Aiken submitted bank statements with handwritten

---

[8](...continued)
transferee under § 550(a)(1) rather than an "immediate or mediate transferee" under § 550(a)(2). As explained by the Sixth Circuit, "[a]n initial transferee is one who receives money from a person or entity later in bankruptcy, and has dominion over the funds.  A mediate or immediate transferee is simply one who takes in a later transfer down the chain of title or possession." *In re Baker & Getty Fin. Servs., Inc.*, 974 F.2d at 722.  The distinction is that "[u]nder § 550(b), a mediate or immediate transferee receives protection if it has taken for value in good faith without knowledge of the voidability of the transfer.  However, an initial transferee receives no such protection." *Id.*

Even if Ms. Aiken was a mediate or immediate transferee of some of the checks, there was no indication that she would qualify for the defenses provided under § 550(b) for mediate or immediate transferees.  It was undisputed that she had knowledge of the bankruptcy proceeding, and in fact, had worked for the Trustee at some point during the case.

18

notations claiming various payments made for expenses associated with the estate's businesses. Though no canceled checks were provided, the handwritten notations on the statements indicate that these expenses covered items ranging from advertising, parts, tires, tobacco seed, flowers for farmers who passed away and utility bills.  Based on the court's calculation, these expenditures amount to $52,996.91 for business expenses of the bankruptcy estate.

There is case law which recognizes a court's equitable power to "off-set" the amount of recovery allowed under § 550(a) based on evidence that value was returned to the debtor by the defendant.  *See Dobin v. Presidential Fin. Corp. of Del. Valley (In re Cybridge Corp.)*, 312 B.R. 262, 265-66 (D.N.J. 2004) (describing the postpetition transfer of collection rights of account receivables to the defendant and the defendant's extension of credit prior to the defendant's notification of the bankruptcy proceeding); *Bakst v. Clarkston (In re Clarkston)*, 387 B.R. 882, 886 (Bankr. S.D. Fla. 2008) (describing the prepetition transfer of real property by the debtor to the defendant, which was then sold by the defendant, and the return of the debtor's share of the proceeds as partially evidenced by canceled checks and testimony of the debtor and the defendant).  In *Cybridge*, the court specifically defined the issue as whether "the Bankruptcy Code empower[s] a court to avoid a post-petition transfer of estate property and permit the trustee to recover the property or value thereof, but then grant the transferee a credit on the grounds that it has already returned the property to the estate."  *In re Cybridge*, 312 B.R. at 269.  The *Cybridge* court held "that the Code does so empower courts, either explicitly under 11 U.S.C. § 550(d) ["The trustee is entitled to only a single satisfaction under subsection (a) of this section."], or as a permissible exercise of equitable power under 11 U.S.C. § 105(a)."  *Id.*; *see also In re Clarkston*, 387 B.R. at 891 (concluding that the court was empowered to prevent double recovery of funds returned to the debtor following the transfer under §§ 550(d) and 105(a)).  Accordingly, the judgment awarded to the Trustee against Ms. Aiken will be reduced by the $52,996.91 expended by her on behalf of the estate.

Lastly, the court turns to the Trustee's request for interest and punitive damages.  As to the latter, there is no authority under the Code for such an award.  Section 550 provides that the trustee may recover "either the property transferred or . . . the value of such property."  11 U.S.C. § 550(a).  As recognized by the district court in the Middle District of Tennessee in rejecting a similar request

19

for punitive damages in a bankruptcy avoidance and recovery action, "Bankruptcy Code Section 550 does not provide for the recovery of exemplary damages. The court cannot invoke state law remedies to circumvent or undermine the specific remedy legislated by Congress for the avoidance of a fraudulent transfer." *Hyundai Translead, Inc.*, 419 B.R. at 760 (quoting *Sherman v. FSC Realty LLC (In re Brentwood Lexford Partners, LLC)*, 292 B.R. 255, 275 (Bankr. N.D. Tex. 2003)); *see also Kleven v. Stewart (In re Myers)*, 320 B.R. 667, 668–69 (Bankr. N.D. Ind. 2005) (no authority under § 550 to award treble damages). Therefore, the Trustee's request for punitive damages will be denied.

With respect to the demand for interest, the Bankruptcy Code does not specify whether the trustee may recover interest in addition to recovering the property or its value in an action to avoid a postpetition transfer under § 549(a). 5 *Collier on Bankruptcy* ¶ 550.02[3] (16th ed. 2011). However, it has been recognized that it is within the equitable discretion of the court to allow prejudgment interest at the rate set forth in 28 U.S.C. § 1961. *See, e.g., In re Sentinel Management Group, Inc.* 398 B.R. 281, 294 n.7 (Bankr. N.D. Ill. 2008). Generally, a trustee may recover prejudgment interest from the earlier of the initial demand for turnover or from the date the complaint was filed. *Williams v. Pillar Capital Holdings, LLC (In re Living Hope Southwest Medical SVCS, LLC)*, 450 B.R. 139, 158 (Bankr. W.D. Ark. 2011).

In the present case, the Trustee asserts that he made written demand on Ms. Aiken by letter dated May 13, 2009, and that he is entitled to prejudgment interest from that date. The May 13, 2009 letter, however, only seeks an assignment to the Trustee of the TTPP rights that the Debtor previously placed in Ms. Aiken's name, and it does not appear that any of the postpetition payments received by Ms. Aiken and avoided herein were for TTPP payments from the federal government. Moreover, the complaint did not set forth an exact amount that the Trustee sought to recover from Ms. Aiken based on all of the Trustee's claims. *See id.* at 158 (awarding prejudgment interest only if the transferee had the ability to ascertain the amount of its liability on the claim without judicial determination ). Accordingly, the Trustee's request for prejudgment interest will be denied.

IV.

In conclusion, the court holds that the Trustee's conspiracy claim must be dismissed, as well as the complaint against Mr. Matchett.  Transfers totaling $394,798.65 are subject to avoidance under § 549(a) and recovery under § 550(a) from Ms. Aiken, less an offset of $52,996.91.  An order will be entered in accordance with the foregoing, granting the Trustee a judgment against Ms. Aiken in the amount of $341,801.74 .

# # #